[Crim. No. 434.   Fourth Appellate District.—July 15, 1938.]

THE PEOPLE, Respondent, v. HOMER V. OWENS, Appellant.

Edgar G. Langford for Appellant.

U: S. Webb, Attorney-General, and Burdette J. Daniels, Deputy Attorney-General, for Respondent.

MARKS, J.—Defendant was charged with murder in the first degree. He was found guilty and sentenced to life imprisonment in the state penitentiary. His sole ground for a reversal of the judgment is based on the contention that the evidence is not sufficient to support the verdict and judgment in that there was not sufficient proof of premeditation and intent to justify a conviction of murder in the first degree. We are asked to reduce the offense to murder in the second degree.

Defendant and Penny May Smith, the deceased, had been living together in the relation of husband and wife without the formality of marriage. On January 13, 1938, Miss Smith rented room 49 on the third floor of the Pacific Hotel in San Diego. Ray Roberts and Ceola Roberts, friends of defendant and deceased, occupied room 23 on the second floor of the same hotel and immediately below room 49.

On the morning of January 13, 1938, defendant informed Mr. and Mrs. Roberts that deceased had been out all night and that he wanted to find her as he was planning to go to Los Angeles. Mrs. Roberts told him she was at the Pacific Hotel and asked him "not to beat her". Defendant and Roberts went to room 49, where they saw deceased. They went back to room 23 and drank a small bottle of wine. Defendant was in room 49 on one other occasion that morning and went to it again shortly before 4 o'clock in the afternoon of that day. Mr. and Mrs. Roberts were in their room. The windows of both rooms were open.

Roberts described what he heard as follows:

"Q. And then he went back up to Room 49? A. Well, he shaken my hands, that he was leaving town. I told him goodby and later I heard his voice up over my room. Q. How much later? A. Oh, I will say about three or four minutes.

Q. About three or four minutes later—and do you remember what the conversation was that you heard coming from the other room? A. Yes, sir. Q. What was it? A. 'Come on and get your clothes on.' Q. That was the first thing that you heard? A. That was the first thing that I heard, yes sir. . . . Q. That you heard—and she says, 'No', and then what did he say? A. Then he says—let's see—he says, 'Who are you talking to?' And she says, 'You', and he says, 'Come on and let's go', and she says, 'I'm not going any place with you', and he says, 'Who are you talking to?' and she says, 'You', and there was a scuffle. Q. Well, now is that all the conversation that you heard then? A. That is all. Q. Before you heard this scream? A. (continuing) that I remember that I heard. Q. Well, did you hear a conversation between Homer and your wife at that time? A. Well, she called up at the time of the scuffle. Q. What did she say? A. She says, 'Homer', and I forget the words, exactly the words that she said, but he talked calmly like everything was all right. . . . Q. You heard no conversation of any kind between Homer and Penny May Smith between Homer's conversation with your wife and the scream? A. No, just a noise, scuffling noise. Q. You did hear some scuffling around? A. Yes, sir. Q. Up in the room—Now how much time would you say passed during this conversation between Penny May Smith and the time of the scream, that is, how long was it after Homer left your room until you heard the scream? A. It was just a short time, I couldn't say the time. Q. Just a very few minutes? A. Yes, sir. Q. And likewise it was just a few seconds after the scream and the other remarks until you heard the noise of someone going downstairs? A. Well, I guess it was about two or three minutes, something like that.''

Mrs. Roberts testified as follows:

''Q. Describe to the jury about how the noises sounded to you. A. Well, there seemed to have been an awful scuffle and a lot of bumping noises. Q. And you heard voices but you couldn't distinguish what was being said? A. No, sir, I couldn't. Q. What did you do, if anything, when you heard them? A. Why, I yelled out the window to Homer. Q. What did you say? A. I said, 'Homer'—I called him and he answered me, and I said, 'You told me you were not going to beat Monkey'. (Miss Smith) Q. What did he say? A.

Well, I don't think he said anything, but he answered me when I called him. Q. Then what happened, after you told him that he said he was not going to beat her? A. Well, the scuffling continued. It stopped only for a half a second and then continued to grow—worse than at first, and then I heard a loud scream from Monkey. Q. And you heard her scream? A. Yes, sir. Q. Did you recognize her voice? A. Yes, sir. Q. What did she say as she screamed? A. She said, 'Police, police', and then she said 'Mama, Mama'. Q. And who is 'Mama'? A. She was referring to the landlady of the Pacific Hotel. Q. And what, if anything, followed after you heard her say, 'Mama, Mama'? A. She said, 'Now you have killed me, you have cut my heart wide open.' Q. What did you hear—did you hear Homer Owens say anything at that time? A. Yes. Q. What did he say? A. Oh, he said, 'I done killed my baby.' Q. Anything further that you heard him say? A. I heard him crying. Q. Then what did you hear next? A. I heard him run downstairs."

Mr. and Mrs. Roberts and the landlady went to the third floor and found deceased lying in a pool of blood in the hall outside room 49. There was no blood in room 49 except a few spots on the carpet near the door. Penny May Smith died shortly thereafter.

An autopsy surgeon described her wounds as follows: "We found the body of a female of the age of twenty-six years, approximately, height five feet five inches; probable weight a hundred and fifteen pounds. She had a tattoo with the letters 'H. V. O.' on her outer right arm above the wrist; a laceration just above the left clavicle. This laceration was three and three-quarters inches in length, which made a dip on the left and passed through the external jugular vein, the most shallow part being in the midline. There was also a puncture wound one-half inch in breadth at the level of the spine—of the left scapula or shoulder blade, one and one-half inches to the left of the midline. It varied in depth from one-half to three-quarters of an inch. The laceration on the neck as formerly described had severed the external jugular vein. The opinion as to the cause of death was hemorrhage due to severage of the external jugular vein."

This witness elsewhere in his testimony described the wound in the back as a "stab wound" between one and one-half and one and three-quarters inches deep, explaining that after

death the flesh had been compressed by the body lying on its back.

A pocket knife with an open blade was found on the floor of the hall near the body of the deceased.

Defendant explained the wound in the neck by saying that it was accidentally inflicted by Miss Smith in a friendly scuffle between the two. He could not explain the wound in the back.

Defendant ran from the Pacific Hotel and was arrested in another part of San Diego at about 8:30 o'clock on that same night. The peace officers were called by Roberts immediately after Miss Smith was found in the hall.

Defendant urges that the foregoing evidence does not show a wilful, deliberate and premeditated intent to kill under the rule announced in *People* v. *Howard,* 211 Cal. 322 [295 Pac. 233, 71 A. L. R. 1385], and *People* v. *Connors,* 124 Cal. App. 216 [12 Pac. (2d) 43].

We believe those two cases are factually distinguishable from the instant case which falls under the rules of *People* v. *Fleming,* 218 Cal. 300 [23 Pac. (2d) 28], and *People* v. *Campos,* 10 Cal. App. (2d) 310 [52 Pac. (2d) 251]. In the Fleming case the Supreme Court said:

"But this court has said on innumerable occasions that in order to prove premeditation in one charged with murder it. is not. necessary to show that any appreciable space of time elapsed between the intention to kill and the act of killing. It is only necessary to quote from *People* v. *Hunt,* 59 Cal. 430, 435, the following statement of the law on this subject: 'There need be no appreciable space of time between the intention to kill and the act of killing; they may be as instantaneous as successive thoughts of the mind. It is only necessary that the act of killing be preceded by a concurrence of will, deliberation, and premeditation on the part of the slayer, and if such is the case, the killing is murder in the first degree, no matter how rapidly these acts of the mind may succeed each other, or how quickly they may be followed by the act of killing.' . . . Where one assaults another violently with a deadly weapon and takes his life the presumption is that the assailant intended death or great bodily harm. (13 Cal. Jur., p. 683.) And where, as in this case, the assault was made in a manner that was reasonably certain to produce death, and which actually did cause death, the

only rational presumption to be drawn therefrom is that the assailant intended to take the life of the person assailed.''

In the Campos case this court said:

''It is argued that there was no proof of the necessary element of malice. Murder is defined in section 187 of the Penal Code as 'the unlawful killing of a human being, with malice aforethought'. Section 188 of the same code declares that malice may be express or implied, that it is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature and that it is implied when no considerable provocation appears or when the circumstances attending the killing shows an abandoned and malignant heart. It is settled that 'malice may always be inferred from the circumstances in the case—the evidence presented and considered by the jury'. (*People* v. *Glover,* 141 Cal. 233, 243 [74 Pac. 745].) . . . The circumstances that were shown to have surrounded the homicide, including the character of weapon used, the nature of the wound inflicted, the fact that the deceased displayed no weapon of any character and was unarmed, the acts and conduct of the accused, furnished ample justification for the indulgence by the jury in the inference that appellant entertained a deliberate purpose to kill the deceased. This properly supported inference warranted the return of a verdict convicting appellant of murder in the first degree. (*People* v. *Mahatch,* 148 Cal. 200 [82 Pac. 779]; *People* v. *Bennett,* 161 Cal. 214 [118 Pac. 710]; *People* v. *Peete,* 54 Cal. App. 333, 342 [202 Pac. 51].)''

In the instant case the wound which caused death was made by a slash with the sharp blade of a pocket knife, a deadly weapon. The wound was sufficient to and did cause death. The wound in the back could hardly have been self-inflicted. Defendant and deceased scuffled violently for several minutes. Defendant said this scuffle commenced on the bed in room 49. There was no blood on or near the bed. The blood pool and spots indicated that the killing occurred in the doorway or in the hall. The jury could have reasonably inferred from the evidence that defendant commenced his assault in the bedroom; that deceased attempted to flee and was finally struck down in the hall. Defendant fled from the scene of his crime. He did not attempt to administer to his victim nor to call medical or any other aid for her. These facts

afford persuasive evidence of a consciousness of guilt. The outcries of deceased at the time of the killing were direct accusations of defendant. His reply was an admission of guilt. These words spoken by the two thoroughly negative defendant's story of an accidental injury during a friendly struggle. The evidence fully justifies the inference of malice and a wilful, deliberate and premeditated intent to kill followed immediately by the blow that caused death.

Judgment affirmed.

Barnard, P. J., and Haines, J., *pro tem.*, concurred.