[Crim. No. 4803. In Bank. Nov. 18, 1947.]

THE PEOPLE, Respondent, v. GEORGE ISBY et al.,
Appellants.

Willard W. Shea, Public Defender; Thomas E. Srednik, John T. Williams, Assistant Public Defenders; George W. Norris, and C. Stephen Casalina for Appellants.

Fred N. Howser, Attorney General; David K. Lener, Deputy Attorney General; Ralph E. Hoyt, District Attorney, and Folger Emerson, Assistant District Attorney, for Respondent.

SPENCE, J.—Defendants George Isby and Robert Shorts were jointly charged with the murder of Jerome Willingham. Upon arraignment, each of the defendants pleaded "not guilty" and "not guilty by reason of insanity" but before trial, each withdrew the latter plea. Respective motions of defendants for a separate trial were denied. In the course of the ensuing joint trial the question of the present sanity of defendant Shorts arose, the jury was excused, and the matter was determined by the court sitting without a jury. The court found defendant Shorts sane. Defendants' joint trial then continued and the jury returned against each defendant a verdict of murder of the first degree, without recommendation. Separate motions by defendants for a new trial were made and denied. Judgment was thereafter pronounced, and each of the defendants was sentenced to suffer the extreme penalty. The cause comes to this court upon an automatic appeal. (Pen. Code, § 1239, subd. (b).)

The principal point to be considered is the contention that the evidence was not sufficient to support the verdicts and judgments in that there was no proof of deliberation and premeditation essential to justify a conviction of murder of the first degree; that there was no showing of motive or intent in the commission of the killing to warrant its classification as other than "a crime of passion," the outgrowth of a quarrel following a card game when "all the parties involved were under the influence of alcohol to some extent"; that the offense could not be regarded as more than murder of the second degree; and that unless this court remands the case for a new trial, it should so modify the judgments in pursuance of its statutory authority. (Pen. Code, § 1181, subd. 6.) The following points are also urged: error in the instructions on the elements of deliberation and premeditation;

error in the admission in evidence of a certain photograph of the locale of the killing; conduct of a portion of the trial in the absence of defendants; improper influence of and misconduct of the jury; misconduct of counsel; and error in the denial of separate trials. In addition, defendant Isby claims that the court erred in receiving in evidence his confession over the objection that he had "insufficient mentality" to "understand ·[its] nature and quality and possible consequences." Careful examination of the record impels the conclusion that defendants were accorded a fair and impartial trial, and that the evidence sustains their conviction of murder of the first degree.

From the evidence adduced at the trial, it appears that on the morning of November 10, 1946, the lifeless body of Jerome Willingham was found near a railroad labor camp maintained by the Santa Fe Railroad at Emeryville in Alameda County. The autopsy disclosed "many wounds over the [deceased's] entire body," including "nineteen stab wounds," particularly in the region of the lungs, and numerous "contusions, lacerations and abrasions"; a "comminuted fracture" of the skull; "second and third degree burns" of the head, face and neck, both arms and hands, the chest and back; a "burned" condition of the "mucous membrane inside of the nose," discovered upon the removal of certain "black burned material protruding from the nostrils"; and a "torn and macerated" liver. The autopsy surgeon testified that it was his opinion that this latter condition "could have been caused by a kick in the abdomen or any heavy blunt blow" and that the "death was due to shock from multiple injuries and burns." Each of the defendants, who are colored men, admitted that he was present at the commission of the crime and that he had inflicted some of the wounds upon the deceased, a white man, but each sought to place the blame for the actual killing upon the other.

The labor camp consisted of a number of bunk cars, commissary cars, and a kitchen maintained by the railroad for the quartering of its employees. Defendant Shorts and Willingham, the deceased, worked for the railroad and lived at the camp. Shorts and one Mack Hughes, also a colored man and a railroad employee, shared the same bunk car. Defendant Isby had formerly worked for the railroad and had then become acquainted with Shorts and Hughes, but his first meeting with Willingham occurred but a few hours prior to the commission of the crime in question.

At the trial Isby gave his version of the crime and the surrounding events as follows: On the evening of November 9, 1946, at about 10:30 or 11 o'clock, Isby went to the railroad labor camp for the purpose of collecting from Hughes a small loan. Hughes was not in his bunk car when Isby arrived, so Isby "went down to another car," where he saw Willingham and some other men talking. Isby, who had drunk "four bottles of beer during the day," joined them for a drink of wine and then left when Willingham began arguing with a "Merchant Marine fellow." Isby returned to Hughes' car, where he found Shorts. Within a few minutes Willingham and "three colored boys" joined them in the car. They all "got down on the floor and commenced shooting craps"; later the "three colored boys" left.

In a few minutes Shorts asked Willingham to leave also, to "go over to [his own] bunk car," but Willingham refused. Thereupon Shorts "walked over behind" Willingham, "hit him with [a] stool" and "knocked him on the floor." Willingham still persisted in his refusal to leave the car, although Isby, too, had begun to urge him to go. Then Isby took a knife out of his pocket and opened it. Shorts took the knife from Isby, "hit Willingham again and knocked him down again," and then putting both his hands against the side of the car, Shorts jumped up and down on Willingham's stomach, "stomping and screwing his heels around." Isby pulled Shorts off of Willingham. Then Shorts "got a piece of paper," "twisted it up," "lit it at the stove," and "put it down in his [Willingham's] nose," saying, "This is the way to kill him quick." Isby claimed that he took the paper out of Willingham's nose. (The autopsy surgeon testified that "black burned material [was] protruding from the nostrils" of Willingham at the time he examined the decedent's body.) Shorts then poured gasoline from a jug on Willingham, lit a match and set him on fire. Willingham managed to "get up on the floor," pulling off his burning coat and shirt, when Isby finally smothered the fire. Thereupon Shorts hit Willingham with a lamp, "stabbed him twice," and then threw "the knife in the heater." Shortly thereafter (about 2 o'clock on the morning of November 10), Mack Hughes "came in" and asked, "What's going on?" Not receiving a reply, Hughes said, "You-all better do something with that man before the other fellows come in." Then Hughes, at Shorts' request, got a towel. Shorts tore it in half, gave one

piece to Isby, and the two of them, using the towel, proceeded to carry Willingham out of the car to the railroad track. Shorts wanted to "lay [Willingham] on the track where the train will cut his head off" but Isby refused on the ground that "we already done him bad enough as it was, we will lay him 'side the track." Isby and Shorts returned to the car, and Shorts started scrubbing it. At Shorts' suggestion, Isby changed his "bloody" trousers, putting on a pair that belonged to Hughes, and Shorts threw Isby's trousers in the stove along with Willingham's coat and shirt. After the car was cleaned, Isby, Shorts and Hughes drank some whiskey and played cards for a while; and then they went to bed.

Shorts testified at first that Isby "told the truth" when on the witness stand, but then he proceeded to give an account which varied in several particulars from Isby's story. Shorts stated that in the early part of the evening of November 9, 1946, he went to town and visited "three beer gardens," where he drank "some beer and wine," "got drunk" but "not too drunk." He then returned to the camp, went to his bunk car, found the door closed and Isby opened it for him. Willingham was lying on the floor. Shorts claimed he then saw Isby kick Willingham, stab him "in the back" and slam him against the floor. Shorts admitted that he hit Willingham with a stool and also stabbed him "a few times" with "Isby's knife," which he then returned to Isby. Shorts agreed with Isby in his statement that after the fracas had progressed that far, Hughes came into the car and told them that they "better get [Willingham] out of there"; but Shorts insisted that as he and Isby carried Willingham outside, it was Isby who suggested that they "put him on the railroad track." Shorts said that he then cleaned up the car.

Mack Hughes was called as a witness on behalf of the prosecution. He testified that he arrived at the bunk car about 2 o'clock on the morning of November 10, 1946; that he knocked on the door, which was closed, and that Isby opened it. Inside the car he saw Shorts and "a white man sitting on the floor . . . bleeding," whom Hughes did not then know but who was later identified as Willingham. Hughes said he asked, "What's going on here?" and Isby replied, "I caught this man messing up, so I messed him up." According to Hughes, Isby thereupon "kicked the man side the head," "picked him up and slammed him back to the floor" while

"he was bleeding" and "groaning." Then stating that "we going to take him out of here," Isby took a towel, tore it in half, gave a piece to Shorts, and then they "took him outside the car." Hughes did not "go out." After a few minutes, Isby and Shorts returned and "started cleaning up the blood, sweeping it up." There was a fire in the stove, and Isby tossed his knife in there, saying: "I am throwing this in here to keep the law from seeing it." The knife was recovered later from the ashes by the police officers in the course of their search of the stove and other parts of the bunk car.

Following their arrest at the camp on the morning of November 10, 1946, each of the defendants made several statements in response to separate questioning by the police and the district attorney on successive occasions. After the usual proof as to the voluntary character of such statements, testimony as to their content was admitted in evidence. It appears that each of the defendants at first denied having any knowledge at all of the crime but that each later admitted that he had taken an active— though subordinate—part in a so-called "fight" with Willingham. Thus after "the fight started," Isby admitted that "he had drawn [his] knife across the throat of the deceased Willingham, and had cut the man's throat just a little bit"; and Shorts confined "his part in the fight" to kicking "the man [Willingham] up the side of the head." Both defendants admitted to having "assisted in moving the body out of the car over to the next car track near where the body was found." Neither defendant claimed, either at the trial or in extrajudicial statements, that he acted in self-defense or that Willingham made any attack or threat of any kind. During the trial the court carefully admonished the jury that "the statement of either of these parties, made either in the way of an admission or confession, is binding only on the man that makes that admission or confession, and not on the other."

In this state of the record, defendants unavailingly argue that the evidence was insufficient to sustain their conviction of murder of the first degree. Murder is defined as "the unlawful killing of a human being, with malice aforethought." (Pen. Code, § 187.) Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature, and it is implied when no considerable provocation appears or when the circumstances attending the kill-

ing show an abandoned and malignant heart. (Pen. Code, § 188.) All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of willful, deliberate and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary or mayhem, is murder of the first degree; and all other kinds of murder are of the second degree. (Pen. Code, § 189.) ■ Thus, where the homicide occurs in the course of the commission of any of the above statutorily enumerated crimes, intent need not be proved; but where death otherwise results, willfulnss, deliberation and premeditation must be established in order to constitute the crime of first degree murder. ■ However, direct evidence of a deliberate and premeditated purpose to kill is not required. The necessary elements of deliberation and premeditation may be inferred from proof of such facts and circumstances in the case as will furnish a reasonable foundation for such an inference, and where the evidence is not in law insufficient, the matter is exclusively within the province of the jury for determination. (13 Cal.Jur., § 14, p. 597; *People* v. *Mahatch,* 148 Cal. 200, 202 [82 P. 779] ; *People* v. *Machuca,* 158 Cal. 62, 64 [109 P. 886] ; *People* v. *Bennett,* 161 Cal. 214, 218 [118 P. 710] ; *People* v. *Bellon,* 180 Cal. 706, 710 [182 P. 420] ; *People* v. *Erno,* 195 Cal. 272, 279 [232 P. 710] ; *People* v. *Smith,* 15 Cal.2d 640, 647 [104 P.2d 510].)

■ In the instant case the circumstances that were shown to have surrounded the homicide—the vicious form and the long duration of the assault, the type of weapon employed and the manner of its use, the nature of the multiple wounds inflicted, the fact that the attack was unprovoked and that the deceased apparently was unarmed at the time—furnished ample justification for the indulgence by the jury in the inference that defendants were possessed of a willful, deliberate and premeditated purpose to kill the deceased. (13 Cal.Jur., § 73, p. 684; *People* v. *Cook,* 15 Cal.2d 507, 516 [102 P.2d 752] ; *People* v. *Smith, supra,* 15 Cal.2d 640, 647; *People* v. *Campos,* 10 Cal.App.2d 310, 316 [52 P.2d 251].) ■ It does not aid defendants in their attack upon their conviction to argue that there was no proof of a motive for the killing. The presence or absence of a motive is only one factor to be considered by the jury in connection with the other factors in the case. (13 Cal.Jur., § 74, p. 685; *People* v. *Durrant,* 116 Cal. 179, 208 [48 P. 75] ; *People* v. *Weston,* 169 Cal. 393,

397 [146 P. 871] ; *People* v. *Larrios,* 220 Cal. 236, 251 [30 P.2d 404].) It is "essentially a question of fact, and, like any other fact, is not necessary to be proved if the crime can otherwise be established by sufficient competent evidence . . . the absence of proof of motive is a fact to be reckoned on the side of innocence, but if the proof of guilt is nevertheless sufficient to overcome the presumption of innocence, the [defendants] must stand convicted, notwithstanding no motive has been shown." (*People* v. *Tom Woo,* 181 Cal. 315, 328 [184 P. 389].) The proof in this case that defendants committed a willful, deliberate and premeditated killing is so strong and convincing that any benefit defendants could seek to allocate to themselves by reason of the absence of a motive is entirely nullified. The evidence as to the terrible means employed by defendants in their prolonged brutal mistreatment of the deceased—their kicking, pummeling, burning and stabbing attacks upon him as he lay bleeding and groaning in the bunk car—undoubtedly weighed heavily against defendants in the jury's estimation of their guilt. While both defendants attempted to shift the blame for the actual killing upon the other, each admitted to having stabbed the deceased with Isby's knife. ■ Such admission by defendants is significant, because where "one assaults another violently with a dangerous weapon, and takes his life, the presumption is that the assailant intended death, or other great bodily harm." (13 Cal.Jur., § 71, pp. 682-683.) So in this case where "the assault was made in a manner that was reasonably certain to produce death, and which actually did cause death, the only rational presumption to be drawn therefrom is that the assailant[s] intended to take the life of the person assailed." (*People* v. *Fleming,* 218 Cal. 300, 312 [23 P.2d 28] ; *People* v. *Owens,* 27 Cal.App.2d 606, 610-611 [81 P.2d 429].) ■ The conflicts in defendants' testimony regarding their relative participation in and responsibility for the actual killing merely presented questions for the jury's determination. Their admitted joint acts—incident to their assault upon the deceased in the bunk car, their subsequent removal of his body to the side of the near-by railroad track, their burning and destroying of physical evidence of their attack upon their victim as they cleaned up the scene of the "fight"—were sufficient to warrant the jury in believing that there was a concert of action between defendants, which would render each of them equally chargeable with the crime. (*People* v. *Erno, supra,* 195 Cal. 272, 278.)

■ Nor does the fact that both defendants had been drinking—beer and wine for the most part—during the afternoon and evening preceding their assault upon the deceased determine that they were incapable of forming the malicious intent essential as an element of murder. It may well be that defendants' passions were aroused by the liquor which they voluntarily drank and that they were in a quarrelsome mood at the time of their "fight" with the deceased. But voluntary intoxication would not excuse their crime. (Pen. Code, §22.)

■ There was no evidence of personal enmity or hostility on the part of defendants against the deceased, but there was evidence that their blood lust had been stirred and that they were willing to slay, and did slay, without provocation. Such evidence clearly indicated malice, which "may always be inferred from the circumstances in the case—the evidence presented and considered by the jury." (*People* v. *Glover,* 141 Cal. 233, 243 [74 P. 745] ; *People* v. *Cook, supra,* 15 Cal.2d 507, 514; *People* v. *Campos, supra,* 10 Cal.App.2d 310, 315; *People* v. *Owens, supra,* 27 Cal.App.2d 606, 611.) ■ Not only did "the circumstances attending the killing show an abandoned and malignant heart" on the part of defendants (Pen. Code, § 188) but, in addition, there was persuasive evidence of their consciousness of guilt—such, for example, would be the matter of defendants' placing of their victim by the railroad track, an act apparently conceived in an effort to establish that the deceased was killed by a passing train, and their cleaning up the bunk car before retiring for the night. In the light of such record, it was for the jury to determine, under proper instructions, which the court gave, whether defendants, by reason of their voluntary intoxication, were incapable of forming the specific criminal intent essential to sustain their conviction; and it cannot be said from the evidence that the jury was not justified in deciding the question against defendants. (*People* v. *Sainz,* 162 Cal. 242, 245; [121 P. 922] ; *People* v. *Burkhart,* 211 Cal. 726, 731 [297 P. 11] ; *People* v. *Yeager,* 194 Cal. 452, 474 [229 P. 40] ; *People* v. *Murphy,* 1 Cal.2d 37, 40 [32 P.2d 635] ; *People* v. *Lami,* 1 Cal.2d 497, 501 [36 P.2d 192].)

As was recognized in the case of *People* v. *Wells,* 10 Cal.2d 610, 616-617 [76 P.2d 493], when an unlawful killing and "*nothing further* is shown, the presumption of law is that it was malicious and an act of murder; but in such a case the verdict should be murder of the second degree, and not mur-

der of the first degree." (Emphasis ours.) But here *much more* than the isolated fact that the deceased was unlawfully killed by defendants was thoroughly established; and considering the law, together with the evidence that hereinbefore has been summarized, the conclusion is inescapable that the jury was warranted in its implied finding that defendants committed a "willful, deliberate, and premeditated killing" within the statutory definition of murder of the first degree. (Pen. Code, § 189.) So pertinent to this point is the well-established rule of law as declared in *People v. Mahatch, supra,* 148 Cal. 200, 203, that "it is exclusively the province of a jury to determine the degree of crime when there is any evidence in the case which will support the determination." (See, also, *People v. Wells, supra,* 10 Cal.2d 610, 626; *People v. Cook, supra,* 15 Cal.2d 507, 515.)

Nor in connection with defendants' challenge of the propriety of their conviction of first degree murder is there merit in their claim that the court erred in refusing to give an instruction offered by the defense on the subject of "premeditation." The court very carefully instructed the jury on every phase of murder, and in giving appropriate emphasis to the matter of the deliberation and premeditation necessary to constitute murder in the first degree as differentiated from murder in the second degree, it embodied in its charge not only the substance, but much of the language approved by this court in the recent case of *People v. Bender,* 27 Cal.2d 164, 178 [163 P.2d 8]. Since the jury was thus fully and fairly informed on this essential point, defendants cannot complain because the court did not adopt the particular phraseology of the refused instruction. (24 Cal.Jur., § 79, p. 806; *People v. Donnelly,* 190 Cal. 57, 59 [210 P. 523]; *People v. Rowland,* 207 Cal. 312, 313 [277 P. 1041]; *People v. Addington,* 43 Cal.App.2d 591, 593-594 [111 P.2d 356].)

Taking up the other above-mentioned contentions urged by defendants, the first is the alleged error of the court in receiving in evidence an enlarged photograph showing the locale of the railroad labor camp, with the deceased's body lying in the foreground. Defendants maintain that the photograph was not admissible because it was taken after the police had taken charge of the situation at the camp and had moved certain railroad cars on the track, thus reflecting "a change in the view" of the premises from the condition prevailing when the deceased's body was found. But at the trial in the

process of identifying the photograph, the camp steward, a witness for the prosecution, testified that "with the exception of the . . . cars"—which had been "cut and moved . . . a couple of car lengths" but which had "nothing to do with the camp set-up at all"—the photograph correctly portrayed the "whole set-up, the camp situation entirely," as well as the position of the deceased's body, as he saw the scene early on the morning of November 10, 1946, before the police arrived. In thereupon admitting the photograph in evidence as the foundation therefor had been laid (*People* v. *Ah Lee,* 164 Cal. 350, 352 [128 P. 1035]), the court expressly stated that "the jury will understand that the railroad car[s] had been moved." Thereafter various witnesses made correlating references to the location of pertinent objects at the scene of the crime, and the photograph, consistent with the purport of its representation as limited by the court, manifestly had evidentiary value in tending to clarify that testimony. (13 Cal.Jur. § 87, p. 710; *People* v. *Clapp,* 26 Cal.App. 523, 527 [147 P. 469]; *People* v. *Spraic,* 87 Cal. App. 724, 727-728 [262 P. 795]; *People* v. *Glab,* 15 Cal.App. 2d 120, 124 [59 P.2d 195].) In these circumstances, the admission in evidence of the photograph was within the trial court's discretion, and clearly was not erroneous. (23 C.J.S., § 852, p. 51; *People* v. *Smith, supra,* 15 Cal.2d 640, 649.)

Nor was it improper, as defendants argue, for the court to permit the photograph to stand on an easel in view of the jury throughout the trial rather than to have it removed from sight at all times when not used by the witnesses for the identification of particular points in the course of their testimony. Such display of the photograph during the entire period of the trial, so as to be available for study and examination by the jury as the need therefor arose, was consistent with the premise of its admission as an appropriate illustrative aid to the jury's better understanding of the facts in evidence. (8 Cal.Jur., § 223, p. 136; *People* v. *Durrant, supra,* 116 Cal. 179, 213.) The alleged gruesome appearance of the photograph would not affect the propriety of its continued exposure at the trial, readily accessible for inspection by the jury as properly admissible evidentiary matter in the case. (*People* v. *Balestieri,* 23 Cal.App. 708, 711 [139 P. 821]; *People* v. *Saenz,* 50 Cal.App. 382, 386 [195 P. 442].)

Defendants' next contention rests on the claim that a portion of the trial was held in their absence, in violation

of their constitutional rights under the due process of law guaranty. (U. S. Const., amend. XIV, § 1; amend. V; Cal. Const., art. I, § 13.) They refer to the following proceedings in support of their position. A photograph of the deceased was admitted in evidence, over objection of defendants that "it was prejudicial, served no useful purpose, and . . . there [was] no foundation for [its] admission." Thereafter the photograph was withdrawn upon motion of counsel for the prosecution made in the judge's chambers when counsel for both defendants were present, but in the absence of defendants and the jury. The withdrawal occurred during the arguments to the jury and on the occasion of a recess taken in the course of the argument of defendant Isby's counsel. The record discloses this discussion between court and counsel incident to the ruling in question: "MR. EMERSON (counsel for the prosecution): I would like to move to withdraw Exhibit 1 (the photograph) from evidence. I intended to do it this morning. THE COURT: I thought you said something about it. MR. NORRIS (counsel for defendant Shorts): I certainly have no objection. MR. WILLIAMS (counsel for defendant Isby): It's in over our objection now. MR. EMERSON: If there is no objection, I will withdraw it from evidence. MR. WILLIAMS: I don't see how we can very well object to it, seeing we objected to it going in. It is just a question if it can be withdrawn now, after the arguments are started. MR. EMERSON: It hasn't been referred to by anybody or seen by the jury yet. THE COURT: Yes, it hasn't exerted any prejudice for or against anyone so far. I didn't even look at it myself. MR. EMERSON: At any rate, I will move that it be withdrawn from evidence. THE COURT: Motion is granted." Thereafter, counsel for defendant Isby resumed his argument, counsel for defendant Shorts made his argument, and counsel for the prosecution made his closing argument.

Defendants rely on the well-settled rule that if the prosecution be for a felony, the accused must be personally present at the trial to validate a conviction. (14 Am.Jur., § 189, p. 898; 7 Cal.Jur., § 75, p. 928; Pen. Code, § 1043.) Accordingly, it has been held in this state, as defendants properly note, that in the trial of a felony the accused must be personally present during the presentation of evidence before the jury (*People* v. *Kohler*, 5 Cal. 72), or when the verdict is returned (*People* v. *Beauchamp*, 49 Cal. 41;

*People* v. *Higgins,* 59 Cal. 357; see, also, Pen. Code, § 1148). And as further illustration of the rule, defendants cite cases holding that the accused was entitled to a new trial where it appeared that in his absence his objection to the introduction of evidence. (*State* v. *Snider,* 81 W.Va. 522 [94 S.E. 981]) or his motion to exclude evidence (*State* v. *Sutter,* 71 W.Va. 371 [76 S.E. 811, 43 L.R.A.N.S. 399]) was argued by the attorneys and decided against him by the judge. But in such instances the required presence of the accused bore a relation, reasonably substantial, to the fullness of his opportunity to protect himself on the criminal charge. In considering this point in relation to the constitutional guaranty of due process, Mr. Justice Cardozo in the case of *Snyder* v. *Massachusetts,* 291 U.S. 97 [54 S.Ct. 330, 78 L.Ed. 674, 90 A.L.R. 575], aptly observed at pages 106-108: "Nowhere in the decisions of this court is there a dictum, and still less a ruling, that the Fourteenth Amendment assures the privilege of presence when presence would be useless, or the benefit but a shadow. . . . [Rather] the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." Thus, it is not necessary for a defendant to be present at proceedings which are merely preliminary or formal and at which matters affecting his guilt are not presented. (23 C.J.S., § 974, subd. b, p. 307; *Mooney* v. *Superior Court,* 130 Cal.App. 521, 522 [20 P.2d 106].) The determinative question is whether or not the accused suffered any damage by reason of absence at a particular stage of the proceedings. (*State* v. *Terrall,* 79 W.Va. 358 [92 S.E. 127, 129]; *Strong* v. *People,* 80 Colo. 284 [250 P. 857, 859].) Manifestly, such was not the case here. The withdrawal of the photograph from evidence upon motion of the prosecution conformed precisely with the position of defendants' counsel in the first place incident to their opposition to its admission. Defendants' personal presence would have availed them of no more than that which they actually received, a favorable ruling on the exclusion of evidence which they deemed objectionable. In such circumstances there can be no valid argument that defendants suffered the slightest, or any, injustice by reason of their absence on the occasion in question. Their constitutional claim cannot prevail upon the basis of a barren technicality, without the remotest shadow of substance to support it. (*Snyder* v. *Massachusetts, supra,* 291 U.S. 97, 109.)

▇▇ Nor can it be said from the record that the withdrawal of the photograph from evidence in the absence of the jury operated to defendants' detriment. The presence of the jury during the proceedings in question was discretionary with the court. (8 Cal.Jur., § 412, p. 381.) But defendants argue that since the photograph was introduced in evidence over their objection, "there unquestionably rested in the minds of the jurors the idea that a piece of evidence detrimental to" defendants "had been admitted" and the ruling on "the offer of withdrawal in chambers outside the presence of the jury . . . failed to give the jury the necessary notice that the [photograph] should never have been introduced." Such argument rests upon pure speculation and conjecture, and is advanced by defendants for the first time on appeal. The jury had not seen the photograph, a fact which the court, in granting the withdrawal, expressly recognized by stating that "it hasn't exerted any prejudice for or against anyone so far." Under the circumstances the photograph was a negative factor in the case, and its ultimate withdrawal cannot be presumed to have influenced the deliberations of the jury. (2 Cal. Jur., § 499, p. 852.)

▇▇ Defendants further contend that the jury was guilty of misconduct "by which a fair and due consideration of [their] case [was] prevented." (Pen. Code, §1181, subd. 3.) Defendants' conviction here is the outcome of a second trial; the first trial ended in a disagreement. Defendants now claim that two or three jurors from the first trial visited the court room in the present trial and there in the presence of the jury, stated to the prosecuting attorney: "We are here to help you. . . . We came to root for" you. Classifying such remarks as an improper influence on the acting jury to bring in verdicts against them, defendants cite the general rule that it is "the duty of the court to see that public sentiment is not expressed to, or in the presence of, the jury in such a way as to be likely to influence their determination." (23 C.J.S., § 970, p. 298.) But the record does not contain the slightest proof in substantiation of defendants' complaint. Their reference to certain portions of the reporter's transcript relating to the argument of opposing counsel on defendants' motions for a new trial only emphasizes the lack of evidence on the point, assuming that the alleged remarks were in fact made. Thus it appears that one of defense counsel, in correlating his successive contentions with the statutory

grounds for a new trial (Pen. Code, § 1181), asserted the occurrence of the remarks in question, and in response to that unsupported claim, counsel for the prosecution pertinently stated: ''There is no showing at this time that such remarks were heard by any member of the last jury which rendered this verdict, nor any showing that if they did, it affected the jury in any way. And I will submit that insufficient evidence has been produced . . . in connection with that point.'' As so challenged, defendants apparently did not deem the matter worthy of further pursuit, for they neither filed affidavits nor offered other evidence in support of the contested point. The same situation prevails with respect to other general assignments of misconduct by the jury made by defendants, and they need not be here detailed, for in the absence of some proof in the record they merit no consideration on appeal. (2 Cal.Jur., § 499, p. 852; 8 Cal.Jur., § 446, p. 420; § 457, p. 434.)

 Nor is there any force to defendants' specification of misconduct on the part of the prosecuting attorney by reason of his remarks in his opening statement to the jury. The record discloses such statement to be no more than a recital of the facts which it was his purpose to establish by evidence during the progress of the trial, ''to the end that the jury [might] more clearly sift and digest'' the case before it. (8 Cal.Jur., § 322, p. 259.) Moreover, defendants made no objection to the statement at the time (*People* v. *Tedesco*, 1 Cal. 2d 211, 221 [34 P.2d 467]), and they neither offered nor requested from the trial court an instruction admonishing the jury that said ''opening statement . . . did not constitute evidence.'' (*People* v. *Chilcott*, 18 Cal.App.2d 583, 588 [64 P.2d 450].) Nevertheless, they now claim that the court should have so instructed the jury on its own motion, but they cite no authority in support of their position. Disregarding the tardiness of defendants' complaint, and in answer thereto, it need only be said that the trial court did cover the subject in its instruction to the jury that ''the statements and arguments of counsel . . . are not evidence in this case and . . . any statements made by counsel either during the trial or argument which are not supported by evidence or which are inconsistent with my instructions as to the law, are to be disregarded by you.'' As was said in *People* v. *Burkhart, supra,* 211 Cal. 726, at page 733: ''It will be presumed that the jurors were true to their oaths and

followed the various admonitions and instructions of the court." (See, also, *People* v. *Green,* 13 Cal.2d 37, 45 [87 P.2d 821].)

■ There is likewise no merit to defendants' position that the court erred in refusing to grant their respective motions for a separate trial. The code section bearing upon this subject provides that when two or more defendants are jointly charged with a public offense, whether felony or misdemeanor, "they must be tried jointly, unless the court order separate trials." (Pen. Code, § 1098.) And it has been held repeatedly that a defendant so charged is not entitled as a matter of right to a separate trial (*People* v. *Rocco,* 209 Cal. 68, 73 [285 P. 704]; *People* v. *Eudy,* 12 Cal.2d 41, 45 [82 P.2d 359]), but that the question of severance is one that must be left necessarily to the determination of the trial court in the exercise of its sound discretion. (*People* v. *Bringhurst,* 192 Cal. 748, 753 [221 P. 897]; *People* v. *Goold,* 215 Cal. 763, 766 [12 P.2d 958; *People* v. *Tinnin,* 136 Cal.App. 301, 317 [28 P.2d 951]; *People* v. *King,* 30 Cal.App.2d 185, 206 [85 P.2d 928].) ■ It is not an abuse of discretion to refuse to grant a demand for separate trials because damaging testimony, admissible against one defendant and not against the other, may be received in the case, but it is then incumbent upon the court to limit such evidence in its application to the defendant to whom it is referable. (*People* v. *Erno, supra,* 195 Cal. 272, 277; *People* v. *Perry,* 195 Cal. 623, 633 [234 P. 890]; *People* v. *Booth,* 72 Cal.App. 160, 165 [236 P. 987].) As above noted in the recital of the evidence in the forepart of this opinion, defendants' respective rights in this regard were carefully preserved throughout their joint trial.

■ The final point to be considered is defendant Isby's claim that the court erred in admitting in evidence his confession because he did not have sufficient mentality to understand its purport. He bases his argument upon the testimony of a psychologist, a witness on his behalf, that he was "well down the scale of feeble-mindedness . . . near the imbecile classification," according to her use of a Stanford-Binet intelligence test on him, showing that while "his actual age was given . . . as 26 years, his mental age was found to be 8 years and 8 months . . . and . . . his intelligence quotient was 58." But defendant does not dispute the fact that he knew "the difference between right and wrong," nor does he

make any claim of insanity, his plea to that effect having been withdrawn. It was for the trial court to determine the competency of defendant in the light of his ability to "perceive, and, perceiving, . . . make known [his] perceptions to others" (Code Civ. Proc., § 1879) and his capacity for "receiving just impressions of the facts . . . or . . . relating them truly" (Code Civ. Proc., § 1880) ; and its ruling in favor of defendant Isby's qualification appears from the record to be well within the limits of judicial discretion. (27 Cal.Jur., § 24, p. 35; *People* v. *Ives,* 17 Cal.2d 459, 476 [110 P.2d 408] ; *In re Mazuran,* 88 Cal.App. 272, 277 [263 P. 339] ; *People* v. *Crandall,* 43 Cal.App.2d 238, 242 [110 P.2d 682].) The weight and effect to be given his statements by reason of his asserted mental deficiency was then properly left to the jury. (*People* v. *Mendez,* 193 Cal. 39, 49 [223 P. 65] ; *People* v. *Tyree,* 21 Cal.App. 701, 706 [132 P. 784].)

The judgment of conviction of each defendant and the order denying the motion of each defendant for a new trial are, and each is, affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Schauer, J., concurred.

Appellant Isby's petition for a rehearing was denied December 15, 1947.