[Crim. No. 2332.   Third Dist.,   Mar. 18, 1952.]

THE PEOPLE, Respondent, v. JORGE RODRIQUEZ RENOSO, Appellant.

Thomas C. Perkins for Appellant.

Edmund G. Brown, Attorney General, and Doris H. Maier, Deputy Attorney General, for Respondent.

VAN DYKE, J.—Appellant, Jorge Rodriquez Renoso, was convicted of the crime of murder of the first degree in a trial before a jury which set the punishment at life imprisonment. He appeals from the judgment imposed in accordance with the verdict, and urges that the record shows no justification for a conviction of first degree murder; that appellant could have been convicted of second degree murder at most.

Appellant argues that there is no evidence of premeditation or deliberation and that the killing was not in perpetration of or in connection with any activity or endeavor which by force of statute disposes of the necessity of proving willfulness and premeditation.

On September 4, 1950, the decedent, one Audrey Wilson, while sitting in a café in Sacramento, entered into conversation with appellant and agreed to go with him to his hotel room for the purpose of sexual intercourse at a price agreed upon. They left the café and went to the room sometime between 10:30 and 11:30 p. m. About midnight a woman's screams were heard coming from appellant's room, and later on a woman was heard moaning therein. About 3:00 a. m. the body of Audrey Wilson was discovered in the lavatory on the second floor of the hotel. Autopsy examination revealed the decedent to have been approximately 35 years of age, 5 feet 5 inches in height, and weighing approximately 125 pounds. Her body bore evidence of severe beating. There was a large contused wound on the back of her head which had a considerable amount of blood beneath the skin, although the skin itself was not broken. On her face there were multiple contusions and abrasions. Thus the lower left jaw was abraded; the left eye and right nostril were discolored, the left ear lobe was discolored and swollen; there was a large contusion and several abrasions over the bone of the left cheek; on her neck, in the region of the trachea, there were eleven small abrasions, five or six on either side, and the underlying tissues were deeply bruised; there was a large black and blue spot over the left collarbone and on the left arm, and there were contusions on the upper part of each arm; there were multiple contusions on both thighs, and an abrasion in the kidney region of the back; the nail of the left middle finger had been torn off, and there was a hemorrhage beneath the nail of the right index finger; there was a tear about 1.7 centimeters long by .7 centimeters wide in the lower rectal area. The autopsy physician testified that death was caused by asphyxiation induced by strangulation.

Appellant was not immediately apprehended, but in June of 1951, while at immigration headquarters in San Francisco, pending deportation to Mexico, he talked with another Mexican national, one Alvarez. He told Alvarez that in Sacramento, and while under influence of some pills he had taken, he had bought drinks for an American girl he found at a bar and had invited her to his room where she said she would go if he would give her $5.00; that they went to the room where he paid her the stipulated price and they engaged in sexual intercourse; that she then wanted to leave, but he refused to let her go, as she had promised "to give him a good time"; that when she tried to leave he grabbed her by the neck and held on until she turned "kind of black"; that while she was in a fainting condition he took her to the bed and "used her" the second time, committing an act of sodomy upon her; that after she regained consciousness she again tried to leave the room and he again grabbed her by the throat and choked her until she became "blacker"; that he again placed her on the bed and "did the same thing"; that thereafter he attempted to revive her, slapping her in the face, and, concluding that she was either fainting or dead, he took her out of his room and to the lavatory where he left her sitting on the seat. Alvarez informed the authorities and appellant was taken into custody. He made statements to the police, admitting he had been registered at the hotel which was the scene of the killing, and at the time thereof. He repeated the same statements he had made to Alvarez up to the conclusion of the act of sexual intercourse, and said that he had then fallen asleep, had been awakened by a noise and found the woman searching his pockets and taking his money. He said he asked her to return his money several times and she refused, whereupon he "got a little mad," grabbed her by the neck, threw her in bed and choked her for about five minutes; that she went limp and he left her in bed for a while, then took her down to the lavatory and left her on the seat.

Appellant took the stand in his own defense. He admitted that the decedent died after he had choked her, and that he took her body to the lavatory and left it on the seat. He repeated the story he had told to Alvarez up to the same point where his recital to the police differed from that to which Alvarez testified. Although he stated that he grabbed the woman by the neck, he insisted he did not intend to kill her. He exhibited his left arm to the jury, which arm appears to

have been atrophied, and said he had little strength in it. He further said he had taken some pills but did not remember what kind they were, and that he was drunk during the affair in the bedroom. He denied making any statement to Alvarez.

We think there is ample support for the jury's verdict of murder in the first degree, and that the foregoing evidence, taken as we must take it on appeal—in the aspect most favorable to the jury's verdict— was sufficient to prove a willful and premeditated killing. It is fairly inferable, if indeed the inference is not compelled as a matter of law, that appellant not only administered a severe beating to the decedent at some time during the period of time before he carried her body to the lavatory, but that in order to make her submit to his sadistic desires he deliberately choked her into a state of insensibility, which means that with the purpose of rendering her helpless he induced asphyxiation almost to the point of death the first time, and beyond that point the second time. When one intends to strangle until his victim has been rendered insensible he intends to strangle almost to the point of death, for death occurs from continuous strangulation within a short time after insensibility occurs. It, therefore, under the law, does not aid appellant that he declares he had no intent to kill, for by the nature of the attack he made, he furnished grounds for the jury's finding that notwithstanding his denial he did so intend.

"A person must be presumed to intend to do that which he voluntarily and willfully does in fact do, and must also be presumed to intend all the natural, probable and usual consequences of his own acts. Therefore, when one person assails another violently with a dangerous weapon, likely to kill, and which does in fact destroy the life of the party assailed, the natural presumption is that such assailant intended death, or other great bodily harm, and in the absence of evidence to the contrary, this presumption must prevail. The willful use of a deadly weapon without excuse or provocation, in such a manner as to imperil life, generally indicates a felonious intent." (*People* v. *Besold*, 154 Cal. 363, 368 [97 P. 871].)

In *People* v. *Isby*, 30 Cal.2d 879, 889 [186 P.2d 405], the court declared that where "one assaults another violently with a dangerous weapon, and takes his life, the presumption is that the assailant intended death, or other great bodily harm."

"If a person voluntarily or willfully does an act which has a direct tendency to destroy another's life, the natural and

necessary conclusion from the act is that he intended so to destroy such person's life.'' (40 C.J.S., Homicide, § 17, p. 864.) ▮ By parity of reasoning, strangling has a direct tendency to kill, and he who does it as appellant did subjects himself to the inference he meant to kill.

Fingers on the throat, cutting off air, have, throughout history, been used to take life. Appellant not only used them in that way once and to the point where death was imminent, but used them that way a second time, with fatal results. The jury were well warranted in concluding that appellant was guilty of willful and premeditated murder.

▮ As to the effect and as to the existence of intoxication and drugging, the sufficient answer is that the matter was one for the jury's consideration. The record shows that they were adequately instructed upon the subject of intoxication and the influence of drugs, and in view of appellant's demonstrated ability to recall in detail the series of happenings at the scene of the crime the jury may well have disbelieved appellant's testimony as to the extent and even as to the existence thereof. From his own statements it is apparent that he knew what he was doing and possessed the mental and physical capacity to carry out his purposes.

In view of what has been said concerning deliberation and premeditation it is unnecessary to discuss appellant's contentions that without proof of deliberation and premeditation no ground existed for the jury's determination that he was guilty of first degree murder.

The judgment appealed from is affirmed.

Adams, P. J., and Schottky, J. pro tem., concurred.