[Crim. No. 9998.   Second Dist., Div. Four.   Feb. 16, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. CHARLES SCOTT RENKIN, Defendant and Appellant.

Stephen M. Price, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Woodruff J. Deem, District Attorney, Edwin M. Osborne, Chief Criminal Deputy, and

Preston W. Hill, Deputy District Attorney, for Plaintiff and Respondent.

JEFFERSON, J.—Defendant was charged, by information, with grand theft in violation of section 487 of the Penal Code. The information also alleged a prior felony conviction. During the course of the trial, and out of the presence of the jury, defendant admitted the prior conviction to be true. The jury found the defendant guilty as charged. Probation was denied and he was sentenced to state prison for the term prescribed by law. Defendant appeals from the judgment of conviction. A summary of the evidence is as follows:

Miriam Miller, the victim of the offense, was an unmarried school teacher, 31 years of age. She was introduced to defendant on September 10, 1963, at a bowling alley in Oxnard. This introduction led to an association between them which lasted until October 3, 1963. During this time they saw each other frequently. On September 21, defendant brought up the subject of marriage. On September 26, he formally proposed marriage, and Miss Miller accepted. Miss Miller knew defendant only by the name of Scott Renkin, the name by which he was introduced to her, although his true name was "E. W. Singer" or "E. Wayne Singer." Defendant told Miss Miller he had been married only once before, and was divorced. Defendant had in fact been married twice. He was divorced from his first wife in 1962. Defendant testified that he "heard" his second wife had filed for divorce. On cross-examination however, he disclosed that he had not been served with a divorce complaint nor had been in communication with his second wife.

Defendant and Miss Miller discussed the question of where they would live after they were married. They "house-hunted" from September 23 to September 27 in the Malibu area and "settled" on purchasing a house for $32,000, which required a down payment of $4,000. Defendant suggested that each of them put in $2,000, and that the title would be taken in Miss Miller's name. On September 27, at defendant's request, Miss Miller withdrew from her savings account the sum of $2,000. With this money she purchased a cashier's check, payable to E. W. Singer, and gave it to defendant to use in the real estate transaction. Defendant told Miss Miller to purchase the cashier's check in the name of E. W. Singer because E. W. Singer was one of the owners of the house they were purchasing. Miss Miller never saw the check again. The house was

never purchased and no further negotiations were undertaken concerning it. Her $2,000 was not returned to her. Defendant testified he was "fairly sure" he cashed the $2,000 check the day it was issued. He further testified that he offered the real estate saleswoman a large cash deposit but the transaction was never completed because of access and water problems.

When defendant and Miss Miller met, Miss Miller owned a 1962 Volkswagen and defendant owned a 1959 Triumph sport coupe and an old Chevrolet. Immediately after defendant's proposal of marriage to Miss Miller he suggested they should trade in her 1962 Volkswagen, together with his "old" Chevrolet, on a Porsche for her. She told defendant that her brother, Torrance Miller, had a 1962 Volkswagen which had more mileage than her car and that she had promised him that if she ever decided to sell it, she would sell to him. On September 29th, at the suggestion of defendant, they went to her brother's home in Whittier intending to trade Volkswagens with him in order that the car with the greater mileage could be used as a trade-in on the Porsche which they intended to buy. Her brother, however, did not have a California pink slip for his Volkswagen. Instead, he wrote a $1,200 check, the amount the car was worth as a trade-in, payable to Miss Miller. She in turn made a general endorsement on the check and gave it to defendant to purchase the Porsche for her. When she saw the defendant the next day, defendant advised her that he had purchased the car, but that it could not be delivered until a dented fender was repaired. The Porsche was never purchased nor delivered, nor was the $1,200 returned to her.

On October 2, Miss Miller signed the pink slip to her Volkswagen in blank at defendant's request, and gave it to him to be delivered to her brother. Neither the car nor the pink slip were delivered to her brother or returned to Miss Miller.

William W. Haws testified that he was general manager of Riviera Imported Cars of Manhattan Beach. In the latter part of 1963 defendant sold him a 1962 Volkswagen and he delivered to defendant a check in the sum of $1,200 as the purchase price. Defendant told him the name "signed off" on the pink slip, "Miriam Lucinda Miller," was that of his sick sister or sister-in-law. When defendant first attempted to sell the Volkswagen to Haws, defendant had no bill of sale or power of attorney to sell the car, and Haws gave defendant a blank power of attorney form to be executed. Defendant returned two days later with the power of attorney form and a bill of sale signed "Miriam Lucinda Miller."

Miss Miller testified she did not sign her name on the bill of sale or the power of attorney form and that she did not endorse the $1,200 check which the used car dealer gave defendant.

Defendant had a date with Miss Miller on October 3. On October 4, when he failed to appear for their next date, she went to his apartment to look for him. The apartment was vacant. October 3 was the last time she saw defendant before his arrest.

Dolores Dundore had a date with defendant on September 27. He told her that he was leaving town because ''two women are closing in on me.''

Defendant was arrested in San Diego.

In defendant's testimony he denied that he intended to steal any money from Miss Miller. According to defendant, after Miss Miller gave him the money to make the down payment on the house, the deal fell through, and she told him to hold the money for her. This money was taken from him on October 1, by hoodlums from a Las Vegas casino where he owed money; he signed Miss Miller's name on the bill of sale and power of attorney form with her full authority to do so; he gambled in Las Vegas with the $1,200 he received from the sale of Miss Miller's car, in an attempt to recoup his losses. Defendant further testified that he told Miss Miller many times that he was going to move on October 1; he moved to an apartment in Hollywood; engaged a telephone answering service; opened a bank account in Beverly Hills, and deposited $2,000; he moved to Sepulveda at the end of October, opened a bank account there, and it was ''very possible'' he made a $1,200 deposit, and other deposits, but this money came from an account in Oroville.

Defendant does not suggest the evidence was insufficient to support his conviction but argues that the court erred in refusing to give certain requested instructions on the subject of partnership, joint enterprise and joint ownership.[1]

While as a general rule a defendant in a criminal case is entitled to instructions based upon his theory of defense, the trial court may properly refuse instructions on any theory which is not supported by substantial evidence. (*People* v.

---

[1]Defendant refers to the following requested but refused instructions:
''No. 7. If you find that Mr. Renkin [defendant] and Miss Miller were partners or joint owners at the time Mr. Renkin used the money in question, he is not guilty of embezzlement.''
''No. 10. If you find that the defendant and Miss Miller were engaged in a joint enterprise when Miss Miller gave the defendant the

332

*Cummings,* 141 Cal.App.2d 193, 201 [296 P.2d 610] ; *People* v. *Evans,* 134 Cal.App.2d 733, 736-737 [286 P.2d 368].)

■ Without passing on the question of whether the requested instructions are a correct statement of the law, it is clear there was no substantial evidence in this case to support such defense theories as partnership, joint enterprise or any other type of joint ownership of the property taken. ■ "A partnership connotes coownership in the partnership property with a sharing in the profits and losses of a continuing business. [Citations.]

■ "A joint venture . . . is an undertaking by two or more persons jointly to carry out a single business enterprise for profit. [Citations.]" (*Nelson* v. *Abraham,* 29 Cal.2d 745, 749 [177 P.2d 931].) ■ There was no evidence of such joint ownership here. Although defendant in his testimony indicated that Miss Miller had, in effect, given him almost an unlimited authority to deal with the property she had entrusted to him, he did not testify that she was making a gift of any part to him. According to his testimony he was her agent in connection with the transactions complained of. The requested instructions were, therefore, properly refused.

■ Defendant further contends that "it was error to allow defendant to be seen by members of the jury while he was handcuffed." However, the record contains no evidence that any juror saw defendant so restrained. The only reference to such an occurrence was the unsupported, unsworn statements of defense counsel during the trial that "defendant appeared in the hall in handcuffs in front of at least three or four members of the jury"; and, that defendant was brought to a room near the courtroom at a time when there were jurors in the hallway. No evidence in the form of affidavits or testimony was offered in support of these statements. In the absence of some proof in the record, such a contention merits no consideration on appeal. (*People* v. *Isby,* 30 Cal.2d 879, 895-896 [186 P.2d 405].)

The judgment of conviction is affirmed.

Files, P. J., and Kingsley, J., concurred.

---

money and property in question here, you must find the defendant not guilty of embezzlement."

"No. 19. It is not a crime for one partner or joint owner to use money or property of the partnership or joint ownership for his own purposes."