Filed 2/25/14  P. v. Hernandez CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE LUIS PERALES-HERNANDEZ,<br><br>    Defendant and Appellant. | A135482<br><br>(Sonoma County<br>Super. Ct. No. SCR604738) |

After a jury convicted defendant Jose Luis Perales-Hernandez of oral copulation (Pen. Code,[1] § 288a, subd. (c)(2)), sexual penetration (§ 289, subd. (a)(1)), and rape (§ 261, subd. (a)(2)), the trial court sentenced him to 18 years in prison.

On appeal, defendant argues that the trial court prejudicially erred by limiting his cross-examination of the rape victim about her immigration status.  Defendant also asserts that defense counsel was ineffective for failing to raise a confrontation clause objection.  We affirm.

### I. EVIDENCE AT TRIAL

#### A.    *Prosecution Case*

The victim, 22-year-old Jane Doe, testified with the assistance of an interpreter. She had been employed by defendant, who was a tomato grower in his 50s.  Doe worked as a field worker, planting and picking tomatoes grown on land that defendant had leased in Santa Rosa ("Santa Rosa field").  Defendant was respectful to Doe when

---

[1]      All further undesignated statutory references are to the Penal Code.

1

other people were present, but when they were alone he said things like he was interested in her, and did not like her having a boyfriend or talking to anyone else. Doe was five and half months pregnant—a fact known to defendant. Doe testified that she had intended to return to Mexico following the birth of her child, and as such, she did not ask defendant to sponsor her for a work visa.

On July 18, 2011, Doe had worked from 7:00 a.m. until about 2:00 p.m. in the Santa Rosa field. She then ate lunch in the field; defendant ate in his truck and drank with a worker from another field, Jose Escalera. Defendant told her to drink a beer; when she said no, explaining that she did not drink, he threatened to show her his penis. Fearful of losing her job, Doe drank two beers to stop him, and threw away beer when he was not looking. After Doe had starting drinking, defendant joked with Escalera about whether he should expose himself anyway. When defendant did expose himself to Doe, she "crouched down" so that she could not see anything. Afterward, defendant apologized, explaining that he "didn't mean anything" by it, and said that they needed to go to work at another field in Sebastopol ("Sebastopol field" or "Sebastopol ranch"). Doe said she went with defendant because there was still several hours left in the workday.

On the way to the Sebastopol field, defendant bought beer to take to the workers, with money he borrowed from Doe. Doe rarely worked at the Sebastopol field and knew the name of only one of defendant's two male workers there, a "Mr. Clemente." Defendant drank beer with the men, but Doe refused. Defendant told her to drink it and said smiling, "[W]e were just going to fertilize and then [go] home." To appease him, she drank small sips. When Clemente said he did not know anything about fertilizing, Doe felt deceived, realizing that they were not there to work after all. She told defendant to take her home or she would call a family member. Defendant said that he did not want anyone coming to the ranch. He said he would take her home after getting more beer and dropping it off for the men. Defendant wanted Doe to lend him some more money for the beer, but she told him that she did not have any. Ultimately, Doe used her ATM card to purchase the additional beer.

2

After returning to the field, defendant said he would take Doe home once they finished the beer. Defendant gave Doe two more beers, but she threw them away. Doe thought she drank about three or four beers in all that day.

After all of the beer was finished, defendant proceeded to take everyone home. Although Doe asked defendant to take her home first, he dropped off the two men first. Defendant then said he needed to pick up some fertilizer at a storage room back at the Sebastopol ranch for use at the Santa Rosa field. On the way back to the ranch, Doe's boyfriend called on her cell phone. Defendant got mad, turned up the radio, and said he did not like that; Doe told her boyfriend she would talk to him later and she hung up.

Defendant then began talking about having a dream about Doe where she was in charge of the tomato growing. Defendant told Doe she could have money without working if she had sex with him; she said no. Defendant parked at the warehouse, and told Doe to get out and help him. Upon entering the storage room, Doe realized defendant had tricked her because there was no farm equipment inside, just a couch. Defendant grabbed her arm. She managed to break free and ran outside, but tripped and fell onto the grass. When she looked up, defendant was in front of her. He grabbed her arms and legs, squeezed her stomach, said it was useless to resist, adding that he always got what he wanted "whether it be a nice way or [a] bad way." Defendant removed her clothes, raped her, and then stood up. Disoriented and naked, Doe first dragged herself away from defendant and then she ran back into the warehouse, where she retrieved her cell phone. Doe ran out of the building and into a grassy area, where she fell again. After hiding in the grassy area for three to five minutes, Doe received a phone call from a friend in Atlanta. Doe told her friend that she had just been raped. Just as Doe's friend was telling her to escape, defendant found her again.

As Doe was lying naked in the grassy field, defendant took hold of her hands, orally copulated her, squeezed her breasts, and bit her neck. Defendant then told her to get dressed, adding that he would hurt her or her family if she said anything and that he had powerful friends to help. Doe said she would tell her brother. Defendant spoke to someone on the phone and said "I have a problem and I need to fix it right now." He

told Doe that he was taking her home. Doe put on her pants and jacket, and also put on defendant's jacket as well.

Once inside defendant's truck, defendant began touching Doe, reminding her that he always gets what he wants "either in a good way or a bad way."

Defendant touched Doe's breasts, and digitally penetrated her. Defendant then removed his hands from Doe and told her to put her seat belt on. Defendant then started to drive the truck. As defendant slowed down for some holes in the road, Doe jumped out of the truck; Doe saw a house not far from the field where defendant had assaulted her. As Doe jumped out of the truck, she hurt her ankle. Doe did not know who lived at the house, but she knew she needed to escape.

The next thing Doe remembered was being inside the house and talking to a police officer, telling him that she was afraid. Doe did not know how she got into the house. Doe explained that she felt traumatized, not drunk.

The tenant in the house, Natalia Brouilete, discovered Doe crying on the floor of the laundry room. Doe was wearing a short, man's jacket, and she appeared to be dirty and intoxicated. Brouilete called the police.

Deputy Sheriff Whiteside responded to a report of an hysterical woman saying she was raped. Doe wore pants, shoes and a "very large black man's jacket." She was disheveled, crying, hyperventilating, and sitting on the floor. She said her boss, "a very large man," raped her. She complained that her ankle and breasts hurt; she limped, smelled of alcohol, and appeared to be at the low end of intoxication. She said that she was five months pregnant and that she had drunk three or four beers. She was very afraid and said defendant, her boss, would find her. She identified the location of the assault at the large farm building and the adjacent field where some of her clothes were strewn.

Around midnight, Doe was examined by a sexual assault nurse practitioner at a nearby hospital emergency room. Doe was disheveled and very distraught. In a limited interview, Doe used some lay Spanish words unfamiliar to the nurse and translator that caused some translation problems. Doe indicated that her boss wanted a sexual

4

relationship with her and told her to drink with him. She did not want to drink because she was five months pregnant, but pretended to drink because she felt she was being forced. The boss assaulted her in his truck, at his work property, and additional times as Doe ran around the property after she got out of the truck. Doe complained of penile, oral, and digital penetration, breast grabbing, grabbing across her stomach, grabbing her right ankle that made her fall as she tried to escape, and "hickeys." The nurse documented suction injuries on Doe's upper chest and neck, abrasions and lacerations on her arms, thighs, abdomen, and breasts, and soil debris in the vaginal area, as well as on Doe's pants and legs.

DNA analysis of defendant's reference sample matched the male profile obtained from a swab of Doe's vagina and right upper chest.

### B.    Defense Case

Defendant testified that Doe worked for him about two months, that they had a good relationship, and that she was happy with him. Doe once had asked him to sponsor her for a work visa, but defendant explained that it was not a good time to apply for one, adding that possibly one day Doe could work at a restaurant.

Defendant testified that on the morning of July 18, 2011, he arrived at the Santa Rosa field around 8:00 a.m.; Doe was already at the property and was picking weeds. They worked until 1:00 p.m., at which point they stopped to have lunch. Lunch lasted about two hours. Defendant, Doe, and Escalera ate lunch and each drank three beers.

Defendant denied telling Doe that he would show her his penis if she did not drink; he denied forcing her drink or otherwise telling her she needed to do so. According to defendant, after lunch, he offered to let Doe go home early because it was hot and he needed to head over to the Sebastopol field. Doe said she did not want to go home because she lived with her aunt and Doe did not get along very well with her. Instead, Doe said she wanted to go with defendant to see the other field.

On the way to the Sebastopol field, defendant stopped to pick up some beer, using $20 of his own money and $20 that Doe lent him. When they arrived at the field, defendant and Doe drank the beer, as did two other workers. Eventually, defendant

5

suggested that they should leave. At this point, Doe told defendant that they should get some more beer, adding that they could stop at her house to " 'get some money.' " Defendant agreed to go get more beer. However, instead of going to Doe's house for money, they ended up using Doe's credit card at a liquor store to buy two 18-packs of beer.

Defendant and Doe then returned to the ranch and joined the other two workers.[2] Everyone drank the beer, especially Doe. Defendant explained that he only had one beer because he needed to able to drive home. According to defendant, Doe drank eight or nine beers. Defendant never saw Doe pouring any of the beer out.

Defendant said everyone stopped drinking around 7:30 p.m., at which point he, Doe, and the two workers left in his truck. Defendant first dropped off the two workers. Defendant then remembered he had forgotten a pump at the Sebastopol ranch that he needed for spraying the tomatoes at the Santa Rosa field. Doe suggested that they go back to the Sebastopol ranch and retrieve the pump.

On the way back to the ranch, Doe, who defendant believed was intoxicated, asked him, " 'Do you want some?' " as she removed her shirt and bra, and threw the bra out the car window along with her "little hat." Defendant said, " 'What are you thinking? What are you doing,' " adding " 'Now it is going to be your word against mine.' " She dropped her pants to her knees and put her "little feetsies up on the dashboard," said, " 'Go for it' " and moved her seat all the way back. He said, " 'No, no, no, you are out of your head.' " He touched her breast and vagina with his hand and told her to settle down. He said that he did not immediately drive her home because she was being "very annoying" and would not get redressed, and he was afraid he might get pulled over by the police. So, defendant proceeded to the Sebastopol ranch to get her to calm down.

---

[2]     The exact time that defendant and Doe returned to the ranch is unclear. At one point, defendant states that it was about 4:00 p.m. However, at another point in his testimony, defendant admits that he was at the liquor store purchasing the beer around 6:00 p.m. and they got back to the ranch around 6:20 p.m.

When they arrived at the ranch, Doe got out of the truck and went into the storeroom. Defendant stayed in the truck. Eventually, however, defendant went inside to check on Doe, thinking she had gone to the restroom. Defendant instead found Doe lying naked on the couch; he asked what she was doing, and she said " 'Awe come on, you know you want to.' " She put her hands down his pants and said, "If you don't do this to me I'm going to say that you are not a man." She asked defendant to "make love with her with [his] mouth all over her body."

Defendant told Doe that he did not want to have sex with her. Defendant testified that he was "impotent," but did not tell Doe about it because he was deeply embarrassed by this condition. Eventually, defendant consensually touched her breasts, returned kisses, sucked her neck, and licked her vagina, but he never tried to penetrate her. He did not rub her vagina with his penis; rather, Doe rubbed his penis on her vagina.

At some point during the incident, Doe asked defendant for money and for a truck. He thought that she was asking him about the job and told her that he would give her money tomorrow. Doe said she wanted to send money to her family in Mexico. He believed that she thought he was a man of money and that she would not have accused him of rape if he had given her money.

At some point, defendant decided to take Doe home. After they got into defendant's truck, but before he put it in gear, Doe got out of the truck. He drove around looking for her, but could not find her. As he was driving away, he saw police lights.

Defendant was arrested at home the next day.

### C.    *Rebuttal*

Deputy Sheriff Altamirano interviewed defendant on July 19, 2011. Defendant said that Doe volunteered to buy the beer when he told her he was out of money. According to defendant, Doe "started to drink like crazy" and was "acting bizarre." Doe told defendant she wanted to have sex with him. She pulled down her pants and threw her bra out the window of his truck and said it was defendant's "opportunity." At

some point, Doe ran away. He could not find her and eventually drove home. Defendant did not mention touching Doe.

When Deputy Altamirano asked defendant about having any physical contact with Doe, he admitted touching Doe's breasts and "private parts." He said he "sucked" Doe's breasts, rubbed his penis on her vagina, and bit her neck. Defendant said Doe volunteered to go buy more beer and supplied a card to purchase two 18-packs of Modelo at the store. They returned to the ranch where the two men were, and Doe drank more beer with them. Doe was a passenger in the truck when defendant drove the men home. Defendant drove back to the ranch because Doe wanted to have sex with him. She undressed herself and leaned back on the seat of the truck and told him "to grab her, to touch her." He touched her legs, breasts, and vagina. Then at the ranch, she went into a small room where he found her naked on the couch with her legs spread; she told him "now is when" and asked if he "could help with money." He rubbed his penis against her vagina.

When Deputy Altamirano asked if defendant's saliva would be found on Doe through DNA, defendant said that he orally copulated her at her request. He said he touched her vagina with both hands, but he was unsure if he inserted his fingers; and his DNA possibly was in her vagina, but he was unsure if he ever penetrated her vagina. Defendant said he could not get an erection. Doe left the room to use the bathroom. He followed and called for her, grabbed her by the hand, and gave her his jacket to take her back to the truck to take her home.

During his interview, defendant did not mention Doe asking him for a work visa.

## II. DISCUSSION

On appeal, defendant argues the trial court prejudicially erred in precluding him from questioning the victim about her immigration status. Defendant contends the proffered evidence was probative of Doe's motive in testifying against him. Defendant further asserts that his trial counsel rendered ineffective assistance by failing to raise a Sixth Amendment objection with respect to the challenged evidence.

8

### A.      *Background*

Under federal immigration regulations (8 C.F.R. § 214.14), an illegal alien who is the victim of certain criminal offenses, including rape or sexual abuse, can apply for a "U-Visa" providing temporary relief from deportation, and acquire temporary non-immigrant legal status if local law enforcement authorities certify that the alien would be of assistance in an investigation or prosecution.  Defendant sought to elicit testimony regarding whether Doe had applied or intended to apply for a U-Visa as evidence of her purported "motive to fabricate the sexual assault."  The court prohibited any questioning about the U-Visa in the absence of any actual documentation regarding Doe's immigration status.  The court was disinclined to hold a "discovery deposition kind of hearing," explaining as follows:  "If you've got evidence that there is some exculpatory document floating out there that she's filled out I'll hear that, but I'm not just going to bring a victim in and go on a fishing expedition on that theory."

The court cautioned that this is a "sensitive area," arising in many cases where the inquiry, in the court's view, lacks substance, except "to pander to the jury to any prejudice they may have against illegal immigrants."  In view of the need to encourage cooperation by victims, the court said it would require "a pretty strong basis that it is relevant" because of the public policy implications of asking victims to admit "illegality."  The court ruled that subject to an Evidence Code section 402 hearing at which defendant established admissibility of the proffered evidence, it was prohibiting it as "irrelevant and inadmissible and overly prejudicial with no probative value to the jury."

Defense counsel then supplemented his proffer by noting that if defendant testified, there would be evidence that he refused Doe assistance in getting a work visa and that she was upset.  The court ruled that when the defense knew defendant would testify, the scope of the testimony could be considered at an Evidence Code section 402 hearing.  Defendant ultimately testified near the end of trial; no Evidence Code section 402 hearing concerning visas was ever held.

### B.      *Relevance*

Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid.Code, § 210.)  " ' " 'The trial court has broad discretion in determining the relevance of evidence [citations] but lacks discretion to admit irrelevant evidence.' " ' [Citation.]" (*People v. Thornton* (2007) 41 Cal.4th 391, 444, citation omissions in original.)  "The test of relevance is whether the evidence tends ' "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. [Citations.]' [Citation.]" (*People v. Scheid* (1997) 16 Cal.4th 1, 13-14.)

We review a trial court's ruling on the admissibility of evidence for abuse of discretion.  (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113 (*Guerra*), disapproved in part on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)  "Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.  [Citation.]" (*Guerra, supra*, 37 Cal.4th at p. 1113.)  "When the trial court excludes relevant, admissible evidence over the defendant's objection, the proper standard of review is whether there is a reasonable probability that there would have been a different result had the evidence been admitted.  [Citations.]" (*People v. Hustead* (1999) 74 Cal.App.4th 410, 422.)

Bias on the part of a witness is a statutory basis for cross-examination. (Evid.Code, § 780, subd. (f).)  Further, "[a]s a general matter, a defendant is entitled to explore whether a witness has been offered any inducements or expects any benefits for his or her testimony, as such evidence is suggestive of bias.  [Citations.]" (*People v. Brown* (2003) 31 Cal.4th 518, 544; *People v. Phillips* (1985) 41 Cal.3d 29, 46-48.) Although " '[c]ross-examination to test the credibility of a prosecuting witness in a criminal case should be given wide latitude' [citation], such latitude does not 'prevent the trial court from imposing reasonable limits on defense counsel's inquiry based on

10

concerns about harassment, confusion of the issues, or relevance' [citations]." (*People v. Brown, supra,* 31 Cal.4th at p. 545.)

We agree with the trial court that the proffered evidence was irrelevant and therefore inadmissible. Evidence is irrelevant if it invites speculation: " '*[i]f the inference of the existence or nonexistence of a disputed fact which is to be drawn from proffered evidence is based on speculation, conjecture, or surmise, the proffered evidence cannot be considered relevant evidence.*' " (*People v. Louie* (1984) 158 Cal.App.3d Supp. 28, 47.) The inference that defendant sought to present to the jury— that Doe had a motive to fabricate the sexual assault in order to receive immigration assistance—was based on mere speculation. Such conjecture is insufficient to establish error in limiting cross-examination. There was no evidence of prosecutorial inducement for the victim's cooperation. No offer of proof was made that actual assistance or benefits of any sort were actually provided to Doe. (See *People v. Dyer* (1988) 45 Cal.3d 26, 50 [absence of proof of some agreement furnishing possible bias or motive to testify].) The trial court did not abuse its discretion in excluding the evidence.[3]

Moreover, even if the trial court erred in precluding defendant from questioning Doe about her immigration status, the error was not prejudicial. Doe did not display bias in her testimony. Instead, she testified credibly and consistently about what happened.

As discussed below, defendant was afforded ample opportunity to test Doe's credibility. Further, other than his own self-serving testimony—which the jury clearly rejected—defendant did not present any witnesses to contradict Doe's version of the events. Accordingly, on this record, it is not "reasonably probable that a result more favorable to [defendant] would have been reached" if the proffered evidence had been

---

[3] Defendant cites to *State v. Valle* (2013) 255 Or. App. 805 [298 P.3d 1237] (*Valle*) for the proposition that a court commits reversible error by excluding evidence that a sexual abuse victim has applied for a U-Visa. It should be noted out-of-state cases are not binding on this court. (*US Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 905.) Further, in *Valle*, unlike in the instant case, it was undisputed that the victim had applied for a U-Visa. ([*Valle, supra,*] 298 P.3d at p. 1240.)

11

admitted.  (See *People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Hustead, supra,* 74 Cal.App.4th at p. 422.)

### C.　　Right of Confrontation and Assistance of Counsel

Defendant next claims that his trial counsel was ineffective by failing to raise a Sixth Amendment challenge, asserting that the court's in limine ruling limiting the scope of cross-examination violated his right of confrontation.

To succeed on a claim of ineffective assistance of counsel, the defendant must demonstrate that (1) counsel's performance was deficient, using an objective standard of professional reasonableness; and (2) the deficient performance prejudiced the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688; *People v. Huggins* (2006) 38 Cal.4th 175, 248.)  We accord a high degree of deference to trial counsel's tactical decisions, and thus counsel's failure to object rarely provides grounds for finding counsel incompetent.  (*People v. Jones* (2009) 178 Cal.App.4th 853, 860.)  We reject such claims on appeal if the record does not affirmatively show why counsel did not object and the circumstances suggest counsel could have had a valid tactical reason for declining to object.  (*Ibid.*)

Here, defendant contends that he was denied the opportunity to cross-examine Doe about her immigration status and that his trial counsel was ineffective by failing to object on confrontation grounds.  The record is silent on the failure to object on confrontation grounds regarding the limitation on cross-examination.  However, counsel could reasonably conclude there was no legitimate basis for a Sixth Amendment objection because he had already unsuccessfully objected to the preclusion of evidence pertaining to Doe's immigration status.  In any event, as we shall explain, defendant's confrontation rights were not violated.

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to confront the prosecution's witnesses.  (*Davis v. Alaska* (1974) 415 U.S. 308, 315.)  The right of cross-examination includes exploration of bias and ulterior motives of the witness.  (*Id.* at p. 316.)  " 'Evidence showing a witness's bias or prejudice or which goes to his credibility, veracity or motive may be elicited during

cross-examination.' [Citation.]" (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1054.) " '[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby, "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." ' [Citations.]" (*People v. Frye* (1998) 18 Cal.4th 894, 946, disapproved in part on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

However, "the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. [Citation.]" (*Chambers v. Mississippi* (1973) 410 U.S. 284, 295; accord, *Alvarado v. Superior Court* (2000) 23 Cal.4th 1121, 1138-1139.) Trial judges retain wide discretion under the confrontation clause to impose reasonable limits on cross-examination based on concerns such as "harassment, prejudice, confusion of the issues . . . or interrogation that is repetitive or only marginally relevant." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679; *People v. Carpenter, supra,* 21 Cal.4th at p. 1051.) "California law is in accord. [Citation.]" (*People v. Frye, supra,* 18 Cal.4th at p. 946.)

" 'Moreover, reliance on Evidence Code section 352 to exclude evidence of marginal impeachment value that would entail the undue consumption of time generally does not contravene a defendant's constitutional rights to confrontation and cross-examination.' [Citation.] '[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." ' (*Delaware v. Van Arsdall, supra,* 475 U.S. at p. 680, quoting *Davis v. Alaska*[*, supra*] 415 U.S. 308, 318.)" (*People v. Pearson* (2013) 56 Cal.4th 393, 455.) In other words, trial courts have broad discretion " 'to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues . . . . [¶] . . . [I]mpeachment evidence

other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present.  Hence, courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value.' [Citation.]" (*People v. Sapp* (2003) 31 Cal.4th 240, 289.)

Thus, " ' "[u]nless the defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witness's] credibility' ([*Delaware v.*] *Van Arsdall, supra,* 475 U.S. at p. 680 . . .), the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment." (*People v. Frye*[, *supra*], 18 Cal.4th [at p.] 946.)' [Citation.]" (*People v. Pearson, supra,* 56 Cal.4th at pp. 455-456.)  We find no abuse of discretion here.

In light of the evidence presented, the jury would not have received a significantly different impression of Doe had the defense been permitted to question her about her immigration status.  (See *Delaware v. Van Arsdall, supra,* 475 U.S. at p. 680; *People v. Frye, supra,* 18 Cal.4th at pp. 946-947.)  The defense was able to impeach Doe's credibility in a variety of ways.  For example, Doe admitted drinking beer the day of the incident knowing it could affect her unborn child, explaining that she did it because she did not want to get fired.  Doe testified she was throwing away beer to avoid getting defendant mad.  Doe went to the Sebastopol field with defendant and lent him money for beer, explaining again that she went along with defendant's conduct because she needed the job to pay her bills.  Moreover, the jury did hear testimony hinting at Doe's immigration status, to wit: defendant testified that Doe asked him to sponsor her for a work visa; Doe, however, denied asking defendant about helping obtain a work visa.

Finally, the jury also heard testimony suggesting that Doe had a financial motive for allegedly fabricating the rape.  As noted, defendant testified that he thought Doe believed he had money and that she would not have claimed rape if he had given her some money.

The record demonstrates that defendant had ample opportunity to impeach Doe's credibility, and we are not persuaded that in light of the evidence presented, the jury

would have received a significantly different impression of Doe had the defense been permitted to question her about her immigration status, or any potential benefit she might receive regarding that status.  (See *Delaware v. Van Arsdall, supra,* 475 U.S. at p. 680; *People v. Frye, supra,* 18 Cal.4th at pp. 946-947.)

### III. DISPOSITION

The judgment is affirmed.


_____
REARDON, J.


We concur:


_____
RUVOLO, P. J.


_____
HUMES, J.